(Slip Opinion) OCTOBER TERM, 2014 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MELLOULI *v.* LYNCH, ATTORNEY GENERAL

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 13–1034. Argued January 14, 2015—Decided June 1, 2015

Petitioner Moones Mellouli, a lawful permanent resident, pleaded guilty to a misdemeanor offense under Kansas law, the possession of drug paraphernalia "to . . . store [or] conceal . . . a controlled substance." Kan. Stat. Ann. §21–5709(b)(2). The sole "paraphernalia" Mellouli was charged with possessing was a sock in which he had placed four unidentified orange tablets. Citing Mellouli's misdemeanor conviction, an Immigration Judge ordered him deported under 8 U. S. C. §1227(a)(2)(B)(i), which authorizes the deportation (removal) of an alien "convicted of a violation of . . . any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of Title 21)." Section 802, in turn, limits the term "controlled substance" to a "drug or other substance" included in one of five federal schedules. 21 U. S. C. §802(6). Kansas defines "controlled substance" as any drug included on its own schedules, without reference to §802. Kan. Stat. Ann. §21–5701(a). At the time of Mellouli's conviction, Kansas' schedules included at least nine substances not on the federal lists. The Board of Immigration Appeals (BIA) affirmed Mellouli's deportation order, and the Eighth Circuit denied his petition for review.

*Held*: Mellouli's Kansas conviction for concealing unnamed pills in his sock did not trigger removal under §1227(a)(2)(B)(i). Pp. 5–14.

(a) The categorical approach historically taken in determining whether a state conviction renders an alien removable looks to the statutory definition of the offense of conviction, not to the particulars of the alien's conduct. The state conviction triggers removal only if, by definition, the underlying crime falls within a category of removable offenses defined by federal law. The BIA has long applied the categorical approach to assess whether a state drug conviction trig-

gers removal under successive versions of what is now
§1227(a)(2)(B)(i). *Matter of Paulus*, 11 I. & N. Dec. 274, is illustra-
tive. At the time the BIA decided *Paulus*, California controlled cer-
tain "narcotics" not listed as "narcotic drugs" under federal law. *Id.*,
at 275. The BIA concluded that an alien's California conviction for
offering to sell an unidentified "narcotic" was not a deportable of-
fense, for it was possible that the conviction involved a substance
controlled only under California, not federal, law. Under the *Paulus*
analysis, Mellouli would not be deportable. The state law involved in
Mellouli's conviction, like the California statute in *Paulus*, was not
confined to federally controlled substances; it also included substanc-
es controlled only under state, not federal, law.

The BIA, however, announced and applied a different approach to
drug-paraphernalia offenses (as distinguished from drug possession
and distribution offenses) in *Matter of Martinez Espinoza*, 25 I. & N.
Dec. 118. There, the BIA ranked paraphernalia statutes as relating
to "the drug trade in general," reasoning that a paraphernalia convic-
tion "relates to" any and all controlled substances, whether or not
federally listed, with which the paraphernalia can be used. *Id.*, at
120–121. Under this reasoning, there is no need to show that the
type of controlled substance involved in a paraphernalia conviction is
one defined in §802.

The BIA's disparate approach to drug possession and distribution
offenses and paraphernalia possession offenses finds no home in
§1227(a)(2)(B)(i)'s text and "leads to consequences Congress could not
have intended." *Moncrieffe* v. *Holder*, 569 U. S. \_\_\_, \_\_\_. That ap-
proach has the anomalous result of treating less grave paraphernalia
possession misdemeanors more harshly than drug possession and
distribution offenses. The incongruous upshot is that an alien is *not*
removable for *possessing* a substance controlled only under Kansas
law, but he *is* removable for using a sock to contain that substance.
Because it makes scant sense, the BIA's interpretation is owed no
deference under the doctrine described in *Chevron U. S. A. Inc.* v.
*Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843. Pp. 5–
11.

(b) The Government's interpretation of the statute is similarly
flawed. The Government argues that aliens who commit *any* drug
crime, not just paraphernalia offenses, in States whose drug sched-
ules substantially overlap the federal schedules are deportable, for
"state statutes that criminalize hundreds of federally controlled
drugs and a handful of similar substances, are laws 'relating to' fed-
erally controlled substances." Brief for Respondent 17. While the
words "relating to" are broad, the Government's reading stretches the
construction of §1227(a)(2)(B)(i) to the breaking point, reaching state-

Syllabus

court convictions, like Mellouli's, in which "[no] controlled substance (as defined in [§802])" figures as an element of the offense.  Construction of §1227(a)(2)(B)(i) must be faithful to the text, which limits the meaning of "controlled substance," for removal purposes, to the substances controlled under §802.  Accordingly, to trigger removal under §1227(a)(2)(B)(i), the Government must connect an element of the alien's conviction to a drug "defined in [§802]."  Pp. 11–14.

719 F. 3d 995, reversed.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, BREYER, SOTOMAYOR, and KAGAN, JJ., joined.  THOMAS, J., filed a dissenting opinion, in which ALITO, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

#### No. 13–1034

### MOONES MELLOULI, PETITIONER *v.* LORETTA E. LYNCH, ATTORNEY GENERAL

#### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

#### [June 1, 2015]

JUSTICE GINSBURG delivered the opinion of the Court.

This case requires us to decide how immigration judges should apply a deportation (removal) provision, defined with reference to federal drug laws, to an alien convicted of a state drug-paraphernalia misdemeanor.

Lawful permanent resident Moones Mellouli, in 2010, pleaded guilty to a misdemeanor offense under Kansas law, the possession of drug paraphernalia to "store, contain, conceal, inject, ingest, inhale or otherwise introduce a controlled substance into the human body." Kan. Stat. Ann. §21–5709(b)(2) (2013 Cum. Supp.). The sole "paraphernalia" Mellouli was charged with possessing was a sock in which he had placed four orange tablets. The criminal charge and plea agreement did not identify the controlled substance involved, but Mellouli had acknowledged, prior to the charge and plea, that the tablets were Adderall. Mellouli was sentenced to a suspended term of 359 days and 12 months' probation.

In February 2012, several months after Mellouli successfully completed probation, Immigration and Customs Enforcement officers arrested him as deportable under 8

U. S. C. §1227(a)(2)(B)(i) based on his Kansas misde-
meanor conviction. Section 1227(a)(2)(B)(i) authorizes the
removal of an alien "convicted of a violation of . . . any law
or regulation of a State, the United States, or a foreign
country relating to a controlled substance (as defined in
section 802 of Title 21)." We hold that Mellouli's Kansas
conviction for concealing unnamed pills in his sock did
not trigger removal under §1227(a)(2)(B)(i). The drug-
paraphernalia possession law under which he was convicted,
Kan. Stat. Ann. §21–5709(b), by definition, related to a
controlled substance: The Kansas statute made it unlaw-
ful "to use or possess with intent to use any drug para-
phernalia to . . . store [or] conceal . . . a controlled sub-
stance." But it was immaterial under that law whether
the substance was *defined in 21 U. S. C. §802.* Nor did
the State charge, or seek to prove, that Mellouli possessed
a substance on the §802 schedules. Federal law
(§1227(a)(2)(B)(i)), therefore, did not authorize Mellouli's
removal.

## I

### A

This case involves the interplay between several federal
and state statutes. Section 1227(a)(2)(B)(i), a provision of
the Immigration and Nationality Act, 66 Stat. 163, as
amended, authorizes the removal of an alien "convicted of
a violation of . . . any law or regulation of a State, the
United States, or a foreign country relating to a controlled
substance (as defined in section 802 of Title 21), other
than a single offense involving possession for one's own
use of 30 grams or less of marijuana." Section
1227(a)(2)(B)(i) incorporates 21 U. S. C. §802, which limits
the term "controlled substance" to a "drug or other sub-
stance" included in one of five federal schedules. §802(6).

The statute defining the offense to which Mellouli
pleaded guilty, Kan. Stat. Ann. §21–5709(b), proscribes

"possess[ion] with intent to use any drug paraphernalia to," among other things, "store" or "conceal" a "controlled substance." Kansas defines "controlled substance" as any drug included on its own schedules, and makes no reference to §802 or any other federal law. §21–5701(a).[1]  At the time of Mellouli's conviction, Kansas' schedules included at least nine substances not included in the federal lists. See §65–4105(d)(30), (31), (33), (34), (36) (2010 Cum. Supp.); §65–4111(g) (2002); §65–4113(d)(1), (e), (f) (2010 Cum. Supp.); see also Brief for Respondent 9, n. 2.

The question presented is whether a Kansas conviction for using drug paraphernalia to store or conceal a controlled substance, §21–5709(b), subjects an alien to deportation under §1227(a)(2)(B)(i), which applies to an alien "convicted of a violation of [a state law] relating to a controlled substance (as defined in [§802])."

B

Mellouli, a citizen of Tunisia, entered the United States on a student visa in 2004. He attended U. S. universities, earning a bachelor of arts degree, *magna cum laude*, as well as master's degrees in applied mathematics and economics. After completing his education, Mellouli worked as an actuary and taught mathematics at the University of Missouri-Columbia. In 2009, he became a conditional permanent resident and, in 2011, a lawful permanent resident. Since December 2011, Mellouli has been engaged to be married to a U. S. citizen.

In 2010, Mellouli was arrested for driving under the influence and driving with a suspended license. During a postarrest search in a Kansas detention facility, deputies discovered four orange tablets hidden in Mellouli's sock. According to a probable-cause affidavit submitted in the

--------

[1] At the time of Mellouli's conviction, Kan. Stat. Ann. §§21–5701(a) and 21–5709(b) (2013 Cum. Supp.) were codified at, respectively, §§21–36a01(a) and 21–36a09(b) (2010 Cum. Supp.).

state prosecution, Mellouli acknowledged that the tablets were Adderall and that he did not have a prescription for the drugs. Adderall, the brand name of an amphetamine-based drug typically prescribed to treat attention-deficit hyperactivity disorder,[2] is a controlled substance under both federal and Kansas law. See 21 CFR §1308.12(d)(1) (2014) (listing "amphetamine" and its "salts" and "isomers"); Kan. Stat. Ann. §65–4107(d)(1) (2013 Cum. Supp.) (same). Based on the probable-cause affidavit, a criminal complaint was filed charging Mellouli with trafficking contraband in jail.

Ultimately, Mellouli was charged with only the lesser offense of possessing drug paraphernalia, a misdemeanor. The amended complaint alleged that Mellouli had "use[d] or possess[ed] with intent to use drug paraphernalia, to-wit: a sock, to store, contain, conceal, inject, ingest, inhale or otherwise introduce into the human body a controlled substance." App. 23. The complaint did not identify the substance contained in the sock. Mellouli pleaded guilty to the paraphernalia possession charge; he also pleaded guilty to driving under the influence. For both offenses, Mellouli was sentenced to a suspended term of 359 days and 12 months' probation.

In February 2012, several months after Mellouli successfully completed probation, Immigration and Customs Enforcement officers arrested him as deportable under §1227(a)(2)(B)(i) based on his paraphernalia possession conviction. An Immigration Judge ordered Mellouli deported, and the Board of Immigration Appeals (BIA) affirmed the order. Mellouli was deported in 2012.

Under federal law, Mellouli's concealment of controlled-substance tablets in his sock would not have qualified as a drug-paraphernalia offense. Federal law criminalizes the sale of or commerce in drug paraphernalia, but possession

—————

[2] See H. Silverman, The Pill Book 23 (13th ed. 2008).

alone is not criminalized at all.  See 21 U. S. C. §863(a)–
(b).  Nor does federal law define drug paraphernalia to
include common household or ready-to-wear items like
socks; rather, it defines paraphernalia as any "equipment,
product, or material" which is "primarily *intended or
designed for use*" in connection with various drug-related
activities.  §863(d) (emphasis added).  In 19 States as well,
the conduct for which Mellouli was convicted—use of a
sock to conceal a controlled substance—is not a criminal
offense.  Brief for National Immigrant Justice Center et al.
as *Amici Curiae* 7.  At most, it is a low-level infraction,
often not attended by a right to counsel.  *Id.,* at 9–11.

The Eighth Circuit denied Mellouli's petition for review.
719 F. 3d 995 (2013). We granted certiorari, 573 U. S.
___ (2014), and now reverse the judgment of the Eighth
Circuit.

## II

We address first the rationale offered by the BIA and
affirmed by the Eighth Circuit, which differentiates para-
phernalia offenses from possession and distribution of-
fenses.  Essential background, in evaluating the rationale
shared by the BIA and the Eighth Circuit, is the categori-
cal approach historically taken in determining whether a
state conviction renders an alien removable under the
immigration statute.[3]  Because Congress predicated de-

––––––––––

[3] We departed from the categorical approach in *Nijhawan* v. *Holder*,
557 U. S. 29 (2009), based on the atypical cast of the prescription at
issue, 8 U. S. C. §1101(a)(43)(M)(i).  That provision defines as an
"aggravated felony" an offense "involv[ing] fraud or deceit in which the
loss to the victim or victims exceeds $10,000."  The following subpara-
graph, (M)(ii), refers to an offense "described in section 7201 of title 26
(relating to tax evasion) in which the revenue loss to the Government
exceeds $10,000."  No offense "described in section 7201 of title 26," we
pointed out, "has a specific loss amount as an element."  557 U. S., at
38. Similarly, "no widely applicable federal fraud statute . . . contains a
relevant monetary loss threshold," *id.,* at 39, and "[most] States had no

portation "on convictions, not conduct," the approach looks to the statutory definition of the offense of conviction, not to the particulars of an alien's behavior. Das, The Immigration Penalties of Criminal Convictions: Resurrecting Categorical Analysis in Immigration Law, 86 N. Y. U. L. Rev. 1669, 1701, 1746 (2011). The state conviction triggers removal only if, by definition, the underlying crime falls within a category of removable offenses defined by federal law. *Ibid.* An alien's actual conduct is irrelevant to the inquiry, as the adjudicator must "presume that the conviction rested upon nothing more than the least of the acts criminalized" under the state statute. *Moncrieffe* v. *Holder*, 569 U. S. ___, ___ (2013) (slip op., at 5) (internal quotation marks and alterations omitted).[4]

The categorical approach "has a long pedigree in our Nation's immigration law." *Id.,* at ___ (slip op., at 6). As early as 1913, courts examining the federal immigration

───────────

major fraud or deceit statute with any relevant monetary threshold," *id.,* at 40. As categorically interpreted, (M)(ii), the tax evasion provision, would have no application, and (M)(i), the fraud or deceit provision, would apply only in an extraordinarily limited and haphazard manner. *Ibid.* We therefore concluded that Congress intended the monetary thresholds in subparagraphs (M)(i) and (M)(ii) to apply "to the specific circumstances surrounding an offender's commission of [the defined] crime on a specific occasion." *Ibid.* In the main, §1227(a)(2)(B)(i), the provision at issue here, has no such circumstance-specific thrust; its language refers to crimes generically defined.

[4] A version of this approach, known as the "modified categorical approach," applies to "state statutes that contain several different crimes, each described separately." *Moncrieffe* v. *Holder*, 569 U. S. ___, ___ (2013) (slip op., at 5). In such cases, "a court may determine which particular offense the noncitizen was convicted of by examining the charging document and jury instructions, or in the case of a guilty plea, the plea agreement, plea colloquy, or some comparable judicial record of the factual basis for the plea." *Ibid.* (internal quotation marks omitted). Off limits to the adjudicator, however, is any inquiry into the particular facts of the case. Because the Government has not argued that this case falls within the compass of the modified-categorical approach, we need not reach the issue.

statute concluded that Congress, by tying immigration penalties to *convictions*, intended to "limi[t] the immigration adjudicator's assessment of a past criminal conviction to a legal analysis of the statutory offense," and to disallow "[examination] of the facts underlying the crime." Das, *supra*, at 1688, 1690.

Rooted in Congress' specification of conviction, not conduct, as the trigger for immigration consequences, the categorical approach is suited to the realities of the system. Asking immigration judges in each case to determine the circumstances underlying a state conviction would burden a system in which "large numbers of cases [are resolved by] immigration judges and front-line immigration officers, often years after the convictions." Koh, The Whole Better than the Sum: A Case for the Categorical Approach to Determining the Immigration Consequences of Crime, 26 Geo. Immigration L. J. 257, 295 (2012). By focusing on the legal question of what a conviction *necessarily* established, the categorical approach ordinarily works to promote efficiency, fairness, and predictability in the administration of immigration law. See *id.,* at 295–310; Das, *supra,* at 1725–1742. In particular, the approach enables aliens "to anticipate the immigration consequences of guilty pleas in criminal court," and to enter "'safe harbor' guilty pleas [that] do not expose the [alien defendant] to the risk of immigration sanctions." Koh, *supra,* at 307. See Das, *supra,* at 1737–1738.[5]

The categorical approach has been applied routinely to assess whether a state drug conviction triggers removal under the immigration statute. As originally enacted, the removal statute specifically listed covered offenses and

---

[5] Mellouli's plea may be an example. In admitting only paraphernalia possession, Mellouli avoided any identification, in the record of conviction, of the federally controlled substance (Adderall) his sock contained. See *supra,* at 3–4.

covered substances. It made deportable, for example, any alien convicted of "import[ing]," "buy[ing]," or "sell[ing]" any "narcotic drug," defined as "opium, coca leaves, cocaine, or any salt, derivative, or preparation of opium or coca leaves, or cocaine." Ch. 202, 42 Stat. 596–597. Over time, Congress amended the statute to include additional offenses and additional narcotic drugs.[6] Ultimately, the Anti-Drug Abuse Act of 1986 replaced the increasingly long list of controlled substances with the now familiar reference to "a controlled substance (as defined in [§802])." See §1751, 100 Stat. 3207–47. In interpreting successive versions of the removal statute, the BIA inquired whether the state statute under which the alien was convicted covered federally controlled substances and not others.[7]

*Matter of Paulus*, 11 I. & N. Dec. 274 (1965), is illustrative. At the time the BIA decided *Paulus*, the immigration statute made deportable any alien who had been "convicted of a violation of . . . any law or regulation relating to the illicit possession of or traffic in narcotic drugs or mari-

—————

[6]The 1956 version of the statute, for example, permitted removal of any alien "who at any time has been convicted of a violation of, or a conspiracy to violate, any law or regulation relating to the illicit possession of or traffic in narcotic drugs, or who has been convicted of a violation of, or a conspiracy to violate, any law or regulation governing or controlling the taxing, manufacture, production, compounding, transportation, sale, exchange, dispensing, giving away, importation, exportation, or the possession for the purpose of the manufacture, production, compounding, transportation, sale, exchange, dispensing, giving away, importation, or exportation of opium, coca leaves, heroin, marihuana, any salt derivative or preparation of opium or coca leaves or isonipecaine or any addiction-forming or addiction-sustaining opiate." Narcotic Control Act of 1956, §301(b), 70 Stat. 575.

[7]See, *e.g.*, *Matter of Fong*, 10 I. & N. Dec. 616, 619 (BIA 1964) (a Pennsylvania conviction for unlawful use of a drug rendered alien removable because "every drug enumerated in the Pennsylvania law [was] found to be a narcotic drug or marijuana within the meaning of [the federal removal statute]"), overruled in part on other grounds, *Matter of Sum*, 13 I. & N. Dec. 569 (1970).

huana." *Id.,* at 275. California controlled certain "narcotics," such as peyote, not listed as "narcotic drugs" under federal law. *Ibid.* The BIA concluded that an alien's California conviction for offering to sell an unidentified "narcotic" was not a deportable offense, for it was possible that the conviction involved a substance, such as peyote, controlled only under California law. *Id.,* at 275–276. Because the alien's conviction was not necessarily predicated upon a federally controlled "narcotic drug," the BIA concluded that the conviction did not establish the alien's deportability. *Id.*, at 276.

Under the *Paulus* analysis, adhered to as recently as 2014 in *Matter of Ferreira*, 26 I. & N. Dec. 415 (BIA 2014),[8] Mellouli would not be deportable. Mellouli pleaded guilty to concealing unnamed pills in his sock. At the time of Mellouli's conviction, Kansas' schedules of controlled substances included at least nine substances—*e.g.*, salvia and jimson weed—not defined in §802. See Kan. Stat. Ann. §65–4105(d)(30), (31). The state law involved in Mellouli's conviction, therefore, like the California statute in *Paulus*, was not confined to federally controlled substances; it required no proof by the prosecutor that Mellouli used his sock to conceal a substance listed under §802, as opposed to a substance controlled only under Kansas law. Under the categorical approach applied in *Paulus*, Mellouli's drug-paraphernalia conviction does not render him deportable. In short, the state law under which he was charged categorically "relat[ed] to a controlled substance," but was not limited to substances "defined in [§802]."[9]

—————

[8] The Government acknowledges that *Ferreira* "assumed the applicability of [the *Paulus*] framework." Brief for Respondent 49. Whether *Ferreira* applied that framework correctly is not a matter this case calls upon us to decide.

[9] The dissent maintains that it is simply following "the statutory text." *Post,* at 1. It is evident, however, that the dissent shrinks to the

The BIA, however, announced and applied a different approach to drug-paraphernalia offenses (as distinguished from drug possession and distribution offenses) in *Matter of Martinez Espinoza*, 25 I. & N. Dec. 118 (2009). There, the BIA ranked paraphernalia statutes as relating to "the drug trade in general." *Id.,* at 121. The BIA rejected the argument that a paraphernalia conviction should not count at all because it targeted implements, not controlled substances. *Id.,* at 120. It then reasoned that a para- phernalia conviction "relates to" any and all controlled substances, whether or not federally listed, with which the paraphernalia can be used. *Id.,* at 121. Under this rea- soning, there is no need to show that the type of controlled substance involved in a paraphernalia conviction is one defined in §802.

The Immigration Judge in this case relied upon *Mar- tinez Espinoza* in ordering Mellouli's removal, quoting that decision for the proposition that "'the requirement of a correspondence between the Federal and State controlled substance schedules, embraced by *Matter of Paulus* . . . has never been extended'" to paraphernalia offenses. App. to Pet. for Cert. 32 (quoting *Martinez Espinoza*, 25 I. & N. Dec., at 121). The BIA affirmed, reasoning that Mellouli's conviction for possession of drug paraphernalia "involves drug trade in general and, thus, is covered under [§1227(a)(2)(B)(i)]." App. to Pet. for Cert. 18. Denying Mellouli's petition for review, the Eighth Circuit deferred to the BIA's decision in *Martinez Espinoza*, and held that a Kansas paraphernalia conviction "'relates to' a federal

―――――――

vanishing point the words "as defined in [§802]." If §1227(a)(2)(B)(i) stopped with the words "relating to a controlled substance," the dissent would make sense. But Congress did not stop there. It qualified "relating to a controlled substance" by adding the limitation "as defined in [§802]." If those words do not confine §1227(a)(2)(B)(i)'s application to drugs defined in §802, one can only wonder why Congress put them there.

controlled substance because it is a crime . . . 'associated with the drug trade in general.'" 719 F. 3d, at 1000.

The disparate approach to state drug convictions, devised by the BIA and applied by the Eighth Circuit, finds no home in the text of §1227(a)(2)(B)(i). The approach, moreover, "leads to consequences Congress could not have intended." *Moncrieffe*, 569 U. S., at \_\_\_ (slip op., at 15). Statutes should be interpreted "as a symmetrical and coherent regulatory scheme." *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 133 (2000) (internal quotation marks omitted). The BIA, however, has adopted conflicting positions on the meaning of §1227(a)(2)(B)(i), distinguishing drug possession and distribution offenses from offenses involving the drug trade in general, with the anomalous result that minor paraphernalia possession offenses are treated more harshly than drug possession and distribution offenses. Drug possession and distribution convictions trigger removal only if they necessarily involve a federally controlled substance, see *Paulus*, 11 I. & N. Dec. 274, while convictions for paraphernalia possession, an offense less grave than drug possession and distribution, trigger removal whether or not they necessarily implicate a federally controlled substance, see *Martinez Espinoza*, 25 I. & N. Dec. 118. The incongruous upshot is that an alien is *not* removable for *possessing* a substance controlled only under Kansas law, but he *is* removable for using a sock to contain that substance. Because it makes scant sense, the BIA's interpretation, we hold, is owed no deference under the doctrine described in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 843 (1984).

## III

Offering an addition to the BIA's rationale, the Eighth Circuit reasoned that a state paraphernalia possession conviction categorically relates to a federally controlled

substance so long as there is "nearly a complete overlap" between the drugs controlled under state and federal law. 719 F. 3d, at 1000.[10]  The Eighth Circuit's analysis, however, scarcely explains or ameliorates the BIA's anomalous separation of paraphernalia possession offenses from drug possession and distribution offenses.

Apparently recognizing this problem, the Government urges, as does the dissent, that the overlap between state and federal drug schedules supports the removal of aliens convicted of *any* drug crime, not just paraphernalia offenses.  As noted, §1227(a)(2)(B)(i) authorizes the removal of any alien "convicted of a violation of . . . any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in [§802])."  According to the Government, the words "relating to" modify "law or regulation," rather than "violation."  Brief for Respondent 25–26 (a limiting phrase ordinarily modifies the last antecedent).  Therefore, the Government argues, aliens who commit "drug crimes" in States whose drug schedules substantially overlap the federal schedules are removable, for "state statutes that criminalize hundreds of federally controlled drugs and a handful of similar substances, are laws 'relating to' federally controlled substances."  Brief for Respondent 17.

We do not gainsay that, as the Government urges, the last reasonable referent of "relating to," as those words appear in §1227(a)(2)(B)(i), is "law or regulation."  The removal provision is thus satisfied when the elements that make up the state crime of conviction relate to a federally controlled substance.  As this case illustrates, however, the Government's construction of the federal removal

_____

[10] The BIA posited, but did not rely on, a similar rationale in *Martinez Espinoza.*  See 25 I. & N. Dec., 118, 121 (2009) (basing decision on a "distinction between crimes involving the possession or distribution of a *particular* drug and those involving other conduct associated with the drug trade in general").

statute stretches to the breaking point, reaching state-court convictions, like Mellouli's, in which "[no] controlled substance (as defined in [§802])" figures as an element of the offense. We recognize, too, that the §1227(a)(2)(B)(i) words to which the dissent attaches great weight, *i.e.*, "relating to," *post*, at 2–3, are "broad" and "indeterminate." *Maracich* v. *Spears*, 570 U. S. ___, ___ (2013) (slip op., at 9) (internal quotation marks and brackets omitted).[11]  As we cautioned in *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 655 (1995), those words, "extend[ed] to the furthest stretch of [their] indeterminacy, . . . stop nowhere." "[C]ontext," therefore, may "tu[g] . . . in favor of a narrower reading." *Yates* v. *United States*, 574 U. S. ___, ___ (2015) (slip op., at 10). Context does so here.

The historical background of §1227(a)(2)(B)(i) demonstrates that Congress and the BIA have long required a direct link between an alien's crime of conviction and a particular federally controlled drug. *Supra*, at 8–9. The Government's position here severs that link by authorizing deportation any time the state statute of conviction bears some general relation to federally controlled drugs.

_____

[11]The dissent observes that certain provisions of the immigration statute involving firearms and domestic violence "specif[y] the conduct that subjects an alien to removal" without "the expansive phrase 'relating to.'" *Post*, at 3. From this statutory context, the dissent infers that Congress must have intended the words "relating to" to have expansive meaning. *Post*, at 3–4. But the dissent overlooks another contextual clue—*i.e.*, that other provisions of the immigration statute tying immigration consequences to controlled-substance offenses contain no reference to §802. See 8 U. S. C. §1357(d) (allowing detainer of any alien who has been "arrested by a Federal, State, or local law enforcement official for a violation of any law relating to controlled substances"); §1184(d)(3)(B)(iii) (allowing Secretary of Homeland Security to deny certain visa applications when applicant has at least three convictions of crimes "relating to a controlled substance or alcohol not arising from a single act"). These provisions demonstrate that when Congress seeks to capture conduct involving a "controlled substance," it says just that, not "a controlled substance (as defined in [§802])."

The Government offers no cogent reason why its position is limited to state drug schedules that have a "substantial overlap" with the federal schedules. Brief for Respondent 31. A statute with *any* overlap would seem to be *related to* federally controlled drugs. Indeed, the Government's position might well encompass convictions for offenses related to drug activity more generally, such as gun possession, even if those convictions do not actually involve drugs (let alone federally controlled drugs). The Solicitor General, while resisting this particular example, acknowledged that convictions under statutes "that have some connection to drugs indirectly" might fall within §1227(a)(2)(B)(i). Tr. of Oral Arg. 36. This sweeping interpretation departs so sharply from the statute's text and history that it cannot be considered a permissible reading.

In sum, construction of §1227(a)(2)(B)(i) must be faithful to the text, which limits the meaning of "controlled substance," for removal purposes, to the substances controlled under §802. We therefore reject the argument that *any* drug offense renders an alien removable, without regard to the appearance of the drug on a §802 schedule. Instead, to trigger removal under §1227(a)(2)(B)(i), the Government must connect an element of the alien's conviction to a drug "defined in [§802]."

\* \* \*

For the reasons stated, the judgment of the U. S. Court of Appeals for the Eighth Circuit is reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 13–1034

_____

## MOONES MELLOULI, PETITIONER *v.* LORETTA E. LYNCH, ATTORNEY GENERAL

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[June 1, 2015]

JUSTICE THOMAS, with whom JUSTICE ALITO joins, dissenting.

The Court reverses the decision of the United States Court of Appeals for the Eighth Circuit on the ground that it misapplied the federal removal statute. It rejects the Government's interpretation of that statute, which would supply an alternative ground for affirmance. Yet it offers no interpretation of its own. Lower courts are thus left to guess which convictions qualify an alien for removal under 8 U. S. C. §1227(a)(2)(B)(i), and the majority has deprived them of their only guide: the statutory text itself. Because the statute renders an alien removable whenever he is convicted of violating a law "relating to" a federally controlled substance, I would affirm.

I

With one exception not applicable here, §1227(a)(2)(B)(i) makes removable "[a]ny alien who at any time after admission has been convicted of a violation of (or a conspiracy or attempt to violate) any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of title 21)." I would hold, consistent with the text, that the provision requires that the conviction arise under a "law or regulation of a State, the United States, or a foreign country

relating to a controlled substance (as defined in section 802 of title 21)." Thus, Mellouli was properly subject to removal if the Kansas statute of conviction "relat[es] to a controlled substance (as defined in section 802 of title 21)," regardless of whether his particular conduct would also have subjected him to prosecution under federal controlled-substances laws. See *ante,* at 6 ("An alien's actual conduct is irrelevant to the inquiry"). The majority's 12 references to the sock that Mellouli used to conceal the pills are thus entirely beside the point.[1]

The critical question, which the majority does not directly answer, is what it means for a law or regulation to "relat[e] to a controlled substance (as defined in section 802 of title 21)." At a minimum, we know that this phrase does not require a complete overlap between the substances controlled under the state law and those controlled under 21 U. S. C. §802. To "relate to" means "'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Morales* v. *Trans World Airlines, Inc.,* 504 U. S. 374, 383 (1992) (quoting Black's Law Dictionary 1158 (5th ed. 1979)). In ordinary parlance, one thing can "relate to" another even if it also relates to other things. As ordinarily understood, therefore, a state law regulating various controlled substances may "relat[e] to a controlled substance (as defined in section 802 of title 21)" even if the statute also controls a few substances that do not fall within the federal definition.

_____

[1] It is likewise beside the point that the pills were, in fact, federally controlled substances, that Mellouli concealed them in his sock while being booked into jail, that he was being booked into jail for his second arrest for driving under the influence in less than one year, that he pleaded to the paraphernalia offense after initially being charged with trafficking contraband in jail, or that he has since been charged with resisting arrest and failure to display a valid driver's license upon demand.

The structure of the removal statute confirms this interpretation. Phrases like "relating to" and "in connection with" have broad but indeterminate meanings that must be understood in the context of "the structure of the statute and its other provisions." *Maracich* v. *Spears*, 570 U. S. \_\_\_, \_\_\_ (2013) (slip op., at 9) ("in connection with"); see also *New York State Conference of Blue Cross & Blue Shield Plans* v. *Travelers Ins. Co.*, 514 U. S. 645, 655 (1995) ("relate to"); see generally *California Div. of Labor Standards Enforcement* v. *Dillingham Constr., N. A., Inc.*, 519 U. S. 316, 324 (1997) (describing the Court's efforts to interpret the "'clearly expansive'" "relate to" language in the pre-emption provision of the Employee Retirement Income Security Act of 1974). In interpreting such phrases, we must be careful to honor Congress' choice to use expansive language. *Maracich*, *supra,* at \_\_\_ (GINSBURG, J., dissenting) (slip op., at 7) (noting that a statute should be interpreted broadly in light of Congress' decision to use sweeping language like "in connection with"); see also, *e.g., Alaska Dept. of Environmental Conservation* v. *EPA*, 540 U. S. 461, 484 (2004) (GINSBURG, J.) (interpreting Environmental Protection Agency's authority in light of the "notably capacious terms" contained in its authorizing statute).

Here, the "structure of the statute and its other provisions" indicate that Congress understood this phrase to sweep quite broadly. Several surrounding subsections of the removal statute reveal that when Congress wanted to define with greater specificity the conduct that subjects an alien to removal, it did so by omitting the expansive phrase "relating to." For example, a neighboring provision makes removable "[a]ny alien who . . . is convicted under any law of purchasing, selling, offering for sale, exchanging, using, owning, possessing, or carrying . . . any weapon, part, or accessory *which is* a firearm or destructive device (as defined in section 921(a) of title 18)." 8 U. S. C.

§1227(a)(2)(C) (emphasis added).  This language explicitly requires that the object of the offense fit within a federal definition.  Other provisions adopt similar requirements. See, *e.g.,* §1227(a)(2)(E)(i) (making removable "[a]ny alien who . . . is convicted of a crime of domestic violence," where "the term 'crime of domestic violence' means any crime of violence (as defined in section 16 of title 18) . . . committed by" a person with a specified family relation- ship with the victim); see generally §1101(a)(43) (defining certain aggravated felonies using federal definitions as elements).  That Congress, in this provision, required only that a law *relate to* a federally controlled substance, as opposed to *involve* such a substance, suggests that it understood "relating to" as having its ordinary and expan- sive meaning.  See, *e.g., Russello* v. *United States*, 464 U. S. 16, 23 (1983).

Applying this interpretation of "relating to," a conviction under Kansas' drug paraphernalia statute qualifies as a predicate offense under §1227(a)(2)(B)(i).  That state statute prohibits the possession or use of drug parapher- nalia to "store, contain, conceal, inject, ingest, inhale or otherwise introduce a controlled substance into the human body."  Kan. Stat. Ann. §21–5709(b)(2) (2013 Cum. Supp.). And, as used in this statute, a "controlled substance" is a substance that appears on Kansas' schedules, §21– 5701(a), which in turn consist principally of federally controlled substances.  *Ante,* at 3; see also Brief for Peti- tioner 3 (listing nine substances on Kansas' schedules that were not on the federal schedules at the time of Mellouli's arrest); Brief for Respondent 8 (noting that, at the time of Mellouli's arrest, more than 97 percent of the named substances on Kansas' schedules were federally con- trolled).  The law certainly "relat[es] to a controlled sub- stance (as defined in section 802 of title 21)" because it prohibits conduct involving controlled substances falling within the federal definition in §802.

True, approximately three percent of the substances appearing on Kansas' lists of "controlled substances" at the time of Mellouli's conviction did not fall within the federal definition, *ante,* at 3, meaning that an individual convicted of possessing paraphernalia may never have used his paraphernalia with a federally controlled substance. But that fact does not destroy the relationship between the *law* and federally controlled substances. Mellouli was convicted for violating a state law "relating to a controlled substance (as defined in section 802 of title 21)," so he was properly removed under 8 U. S. C. §1227(a)(2)(B)(i).

## II
### A

The majority rejects this straightforward interpretation because it "reach[es] state-court convictions . . . in which '[no] controlled substance (as defined in [§802])' figures as an element of the offense." *Ante,* at 13. This assumes the answer to the question at the heart of this case: whether the removal statute does in fact reach such convictions. To answer that question by assuming the answer is circular.

The majority hints that some more limited definition of "relating to" is suggested by context. See *ibid.* I wholeheartedly agree that we must look to context to understand indeterminate terms like "relating to," which is why I look to surrounding provisions of the removal statute. These "reveal that when Congress wanted to define with greater specificity the conduct that subjects an alien to removal, it did so by omitting the expansive phrase 'relating to.'" *Supra,* at 3. For its part, the majority looks to the context of other provisions referring to "controlled substances" without a definitional parenthetical, *ante,* at 13, n. 11, and rejoins that the most natural reading of the statute "shrinks to the vanishing point the words 'as

defined in [§802],'" *ante,* at 9–10, n. 9. But the definition
of controlled substances *does* play a role in my interpreta-
tion, by requiring that the law bear some relationship to
*federally* controlled substances. Although we need not
establish the precise boundaries of that relationship in
this case given that Kansas' paraphernalia law clearly
qualifies under any reasonable definition of "relating to,"
the definition of controlled substances imposes a meaning-
ful limit on the statutes that qualify.

## B

The majority *appears* to conclude that a statute "relates
to" a federally controlled substance if its "definition of the
offense of conviction" necessarily includes as an element of
that offense a federally controlled substance. *Ante,* at 6.
The text will not bear this meaning.

The first problem with the majority's interpretation is
that it converts a removal provision expressly keyed to
features of the statute itself into one keyed to features of
the underlying generic offense. To understand the differ-
ence, one need look no further than this Court's decision in
*Moncrieffe* v. *Holder*, 569 U. S. ___ (2013). In that case,
removal was predicated on the generic offense of "illicit
trafficking in a controlled substance." *Id.,* at ___ (slip op.,
at 2). Thus, in order to satisfy the federal criteria, it was
necessary for the state offense at issue to have as elements
the same elements that make up that generic offense. *Id.,*
at ___ (slip op., at 5). By contrast, §1227(a)(2)(B)(i) does
not refer to a generic offense for which we must discern
the relevant criteria from its nature. Instead, it establishes
the relevant criteria explicitly, and does so for the law
of conviction itself rather than for some underlying generic
offense—that is, the law of conviction must "relat[e] to" a
federally controlled substance.

The only plausible way of reading the text here to refer
to a generic offense that has as one element the involve-

ment of a federally controlled substance would be to read
"relating to" as modifying "violation" instead of "law."
Under that reading, the statute would attach immigration
consequences to a "*violation . . .* relating to a controlled
substance (as defined in section 802 of title 21)," rather
than a violation of a "*law . . .* relating to a controlled sub-
stance (as defined in section 802 of title 21)." Yet the
majority expressly—and correctly—rejects as grammati-
cally incorrect Mellouli's argument that the "relating to"
clause modifies "violation." *Ante,* at 12.

Having done so, the majority can reconcile its outcome
with the text only by interpreting the words "relating to"
to mean "regulating only." It should be obvious why the
majority does not make this argument explicit. Even
assuming "regulating only" were a *permissible* interpreta-
tion of "relating to"—for it certainly is not the most natu-
ral one—that interpretation would be foreclosed by Con-
gress' pointed word choice in the surrounding provisions.
And given the logical upshot of the majority's interpreta-
tion, it is it even more understandable that it avoids offer-
ing an explicit exegesis. For unless the Court ultimately
adopts the modified categorical approach for statutes, like
the one at issue here, that define offenses with reference
to "controlled substances" generally, and treats them as
divisible by each separately listed substance, *ante,* at 6,
n. 4, its interpretation would mean that *no* conviction
under a controlled-substances regime more expansive than
the Federal Government's would trigger removal.[2] Thus,

_____

[2] If the Court ultimately adopts the modified categorical approach, it
runs into new textual problems. Under that approach, an alien would
be subject to removal for violating Kansas' drug paraphernalia statute
whenever a qualifying judicial record reveals that the conviction
involved a federally controlled substance. If that result is permissible
under the removal statute, however, then Kansas' paraphernalia law
must qualify as a law "relating to" a federally controlled substance.
Otherwise, the text of the statute would afford no basis for his removal.

whenever a State moves first in subjecting some newly
discovered drug to regulation, every alien convicted during
the lag between state and federal regulation would be
immunized from the immigration consequences of his
conduct. Cf. Brief for Respondent 10 (explaining that two
of the nine nonfederally controlled substances on Kansas'
schedules at the time Mellouli was arrested became feder-
ally controlled within a year of his arrest). And the Gov-
ernment could never, under §1227(a)(2)(B)(i), remove an
alien convicted of violating the controlled-substances law
of a State that defines "controlled substances" with refer-
ence to a list containing even one substance that does not
appear on the federal schedules.

Finding no support for its position in the text, the major-
ity relies on the historical background, *ante,* at 13–14, and
especially the Board of Immigration Appeals' (BIA) deci-
sion in *Matter of Paulus*, 11 I. & N. Dec. 274 (1965)—a
surprising choice, given that the majority concludes its
discussion of that history by acknowledging that the BIA's
atextual approach to the statute makes "scant sense,"
*ante,* at 11. To the extent that the BIA's approach to
§1227(a)(2)(B)(i) and its predecessors is consistent with
the majority's, it suffers from the same flaw: It fails to
account for the text of the removal provision because it
looks at whether the *conviction* itself necessarily involved
a substance regulated under federal law, not at whether
the statute related to one. See *Paulus*, 11 I. & N. Dec., at
276 ("[O]nly a *conviction* for illicit possession of or traffic
in a substance which is defined as a narcotic drug under
federal laws can be the basis for deportation" (emphasis
added)); *Matter of Ferreira*, 26 I. & N. Dec. 415, 418–419
(BIA    2014)    (modeling    its    categorical    approach    to

_____

It would then follow that any alien convicted of "a violation of" that law
is removable under §1227(a)(2)(B)(i), *regardless* of whether a qualifying
judicial record reveals the controlled substance at issue.

§1227(a)(2)(B)(i) after the analysis in *Moncrieffe*, which, as explained above, keyed removal to the characteristics of the offense).

Section 1227(a)(2)(B)(i) requires only that the state law itself, not the "generic" offense defined by the law, "relat[e] to" a federally controlled substance. The majority has not offered a textual argument capable of supporting a different conclusion.

\*    \*    \*

The statutory text resolves this case. True, faithfully applying that text means that an alien may be deported for committing an offense that does not involve a federally controlled substance. Nothing about that consequence, however, is so outlandish as to call this application into doubt. An alien may be removed only if he is convicted of violating a law, and I see nothing absurd about removing individuals who are unwilling to respect the drug laws of the jurisdiction in which they find themselves.

The majority thinks differently, rejecting the only plausible reading of this provision and adopting an interpretation that finds no purchase in the text. I fail to understand why it chooses to do so, apart from a gut instinct that an educated professional engaged to an American citizen should not be removed for concealing unspecified orange tablets in his sock. Or perhaps the majority just disapproves of the fact that Kansas, exercising its police powers, has decided to criminalize conduct that Congress, exercising its limited powers, has decided not to criminalize, *ante,* at 4–5. Either way, that is not how we should go about interpreting statutes, and I respectfully dissent.